IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ASPEN AMERICAN INSURANCE COMPANY,<br><br>**Plaintiff,**<br><br>v.<br><br>NAYIP RODRIGUEZ-PELLICIER,<br><br>**Defendant.** | **CIVIL NO. 25-1089 (RAM)** |

**OPINION AND ORDER**

RAÚL M. ARIAS-MARXUACH, United States District Judge

Pending before the Court is Plaintiff Aspen American Insurance Company's ("Aspen") *Motion for Default Judgment* (Docket No. 10) against Defendant Nayip Rodriguez-Pellicier ("Dr. Rodriguez").

## I. FACTUAL BACKGROUND

Aspen is a corporation organized in Texas with its principal place of business in New York. (Docket No. 10-1 at 2). It is authorized to operate as an insurer in Puerto Rico. Id. Dr. Rodriguez is a natural person whose mailing address is P.O. Box 1332, Cabo Rojo, PR 00623. Id. On or about July 8, 2024, Dr. Rodriguez submitted an Inboard Yacht Application (the "Application") to Aspen through its general agent, Blue Waters Insurers, Co. (Docket No. 1 ¶ 6). Pursuant to the information disclosed in the Application, Aspen issued Dr. Rodriguez a marine insurance policy (the "Policy") for "a Tiara 44, HID# SSUXB039F516, built in the year 2015 with Cummins main engines

and named CENTRO VISIÓ" (the "Vessel"). Id. ¶ 7. The Policy was active from July 8, 2024, to July 8, 2025, and provided "hull, personal property, protection and indemnity, underinsured and uninsured, pollution, medical payments, sea tow, longshore & harbor workers compensation coverages, subject to all its terms, conditions, limitations and exclusions." Id. ¶ 8.

Between 1:00 AM and 2:00 AM AST on January 11, 2025, the Vessel sank at Marina Club Deportivo del Oeste; that same day, Dr. Rodriguez filed a claim (the "Claim") under the Policy over the sinking. Id. ¶¶ 10-11. According to Dr. Rodriguez, the Vessel had been moved from its usual slip to "the inshore side of the [m]arina's breakwater, near the northwest corner of the [m]arina's basin." Id. ¶ 13. It was in this position "to facilitate the removal and replacement of the starboard side main engine," with technicians last working on the Vessel on January 9, 2025. Id. ¶¶ 14-15. At the time of the sinking, the Vessel's starboard side main engine had been separated from its mount, the shaft decoupled from the transmission, and various components of the Vessel, including raw water to the starboard engine and the exhaust manifold, had been disconnected. Id. ¶ 16. The main engines receive cooling water from the sea via "port and starboard 2" suction scoops, each fitted with 2" ball valves, with hoses leading to sea water strainers, and then onwards to the raw water pump." Id. ¶ 17. The exhaust manifold had also been disconnected from the exhaust

pipe, "leaving a nearly 6" diameter opening, which was sealed with a pillow." Id. ¶ 18. The engine room muffler pipe end is located "approximately 1" above the Vessel's floating waterline," meaning that, while the exhaust would not flood the engine room under static conditions, minimal wave action or water ingress would "allow the exhaust pipe to start flooding the engine room." Id.

Dr. Rodriguez alleged that the Vessel sank after heavy swells "violently" moved it, forcing the starboard propeller to hit rocks on the sea bottom, moving the shaft, and allowing water to enter the Vessel through the stern tube seal. Id. ¶ 19. However, when the Vessel was raised, Aspen inspected the starboard propeller and observed no signs of damage as would have been expected from a violent impact against the sea bottom. Id. ¶ 21. Aspen asserts that the swells that evening were mild and do not appear to have affected any other vessels, including those that were closer to the harbor entrance. Id. ¶ 22. Pictures taken that evening "show a calm and still water surface." Id.

On January 23, 2025, Aspen examined Dr. Rodriguez under oath and learned that he had misrepresented certain facts when applying for insurance coverage and during the investigation of the sinking and his subsequent claim. Id. ¶ 23. First, in both the Application and his examination, Dr. Rodriguez did not disclose any prior accidents, losses, or insurances claims stemming from any vessels he had owned.

Id. However, Aspen learned that Dr. Rodriguez had previously filed three unsuccessful claims: (i) a claim related to damages from Hurricane María; (ii) a claim for glass damage to the Vessel incurred on or about April 11, 2018; and (iii) a claim related to the same damage that occurred on April 11, 2018. Id. Second, Dr. Rodriguez did not disclose ownership of any prior vessels on the Application, but during his examination, he admitted to having owned another vessel previously. Id. Third, Dr. Rodriguez marked a box on the Application that indicated he had previously taken a navigation course but admitted in his examination that he had never taken any navigation courses. Id. Fourth, Dr. Rodriguez reported having paid $905,000.00 for the Vessel on his Application, but during his examination, he admitted the exact price paid was $999,999.00. Id. Fifth, Dr. Rodriguez stated in his Application that he had purchased the Vessel on March 22, 2015, but the Vessel's title states that it was purchased on October 16, 2015. Id. Sixth, Dr. Rodriguez wrote "N/A" on the Application when asked if he employed a paid crew on the Vessel, but during his examination, he admitted "that he had a hired captain since 2015 and that he used his services the majority of the time." Id. The captain's name, identity, and marine credentials were never disclosed. Id.

Aspen also maintains that after the sinking, it learned the Vessel was in unseaworthy condition before Dr. Rodriguez obtained the

policy, and that Dr. Rodriguez knew or should have known about the Vessel's condition. Id. ¶ 24. Namely, an investigation of the sinking showed that "the bellow of the starboard side stern tube seal was found to be dry-cracked and deteriorated[,] which is indicative of wear and tear, rot, gradual deterioration, or weathering." Id. ¶ 25. The damage must have developed over and been present for a considerable amount of time. Id. Aspen asserts that the damage to the Vessel is not covered by the Policy, and in any event, the Policy is void due to the misrepresentations made by Dr. Rodriguez in the Application. Id. ¶¶ 31, 35, 38, 41-43, 47, 50-51, 58.

## II. PROCEDURAL BACKGROUND

Aspen filed the instant *Complaint* on February 12, 2025. (Docket No. 1). This Court has jurisdiction pursuant to 28 U.S.C. § 1333 as this is an admiralty and maritime case. Id. ¶ 3. The *Complaint* lists as causes of action: (i) misrepresentation and concealment; (ii) breach of absolute implied warranty of seaworthiness; (iii) breach of warranty of truthfulness; (iv) breach of the express and continuing warranty of seaworthiness; (v) the Claim does not trigger the Policy; and (vi) in any event, the Claim is excluded by Exclusions 1 and 5 of the Policy. *See* id. at 9-16. Aspen seeks a declaratory judgment that the Policy does not cover Dr. Rodriguez's Claim for damages stemming from the Vessel's January 11, 2025, sinking. Id. ¶ 59.

Summons was issued to Dr. Rodriguez on February 13, 2025, and executed on March 19, 2025. (Docket Nos. 3 and 5). The process server was unable to meet Dr. Rodriguez in person, but Dr. Rodriguez's wife accepted service of process on his behalf and with Dr. Rodriguez's approval. (Docket No. 5 ¶¶ 1, 4-6). However, Dr. Rodriguez has not plead or otherwise defended himself in the instant case. Aspen filed a *Motion for Default Entry* on April 10, 2025; on April 11, 2025, the Court granted the motion and the Clerk of Court entered default upon Dr. Rodriguez. (Docket Nos. 7; 8 and 9). On April 30, Aspen filed the *Motion for Default Judgment*, seeking default judgment "declaring that [Aspen] was in its legal right to deny coverage for the incident reported to [Aspen] on January 11, 2024, on account of the Policy exclusions, Defendant's breach of the Policy terms and conditions and the federally entrenched maritime principle of *uberrimae fidei*." (Docket No. 10 at 15).

### III. APPLICABLE LAW

**A. Default Judgment**

A default judgment is appropriate when a "party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend" and this failure is shown "by affidavit or otherwise." Fed. R. Civ. P. 55(a). First, an entry of default must be entered by the clerk pursuant to Fed. R. Civ. P. 55(a). *See* Universitas Educ., LLC v. Granderson, 98 F.4th 357, 377 (1st Cir.

2024) (citations omitted); *see also* Franco v. Selective Ins. Co., 184 F.3d 4, 8 (1st Cir. 1999) ("In federal court, entry of a default is a step prior to entry of a judgment of default and the default can readily be set aside for good cause."). Second, the default judgment must be entered. Fed. R. Civ. P. 55(b). This can be made by the clerk if the plaintiff's claim is for a sum certain or one that can be made certain by computation, but otherwise, the party seeking default judgment must apply to the court. Fed. R. Civ. P. 55(b)(1)-(2). Upon the entry of default, a court "must accept as true all well-pleaded factual allegations in the complaint." Nat'l Council of Exam'rs for Eng'g and Surveying v. Cameron-Ortiz, 626 F.Supp. 2d 262, 267 (D.P.R. 2009) (citation omitted).

### B. Declaratory Judgment

The Declaratory Judgment Act provides that:

> In a case of actual controversy within its jurisdiction...any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201. The Act is intended to "enable litigants to clarify legal rights and obligations before acting upon them." Almonte Almonte v. Administracion de Correccion, 15 F.Supp. 2d 180, 181 (D.P.R. 1998) (quoting Ernst & Young v. Depositors Econ.

Civil No. 25-1089 (RAM)                                                         8

Prot. Corp., 45 F.3d 530, 534 (1st Cir. 1995)). A party seeking declaratory judgment faces two obstacles. First, the party must show that its suit is based on an "actual controversy," as imposed by Article III of the Constitution. Id. at 181-82 (citation omitted). Second, "federal courts retain substantial discretion in deciding whether to grant declaratory relief," meaning that there is no absolute right for a party to seek a declaratory judgment. Ernst & Young, 45 F.3d at 534 (citation omitted); see El Dia, Inc. v. Hernandez Colon, 963 F.2d 488, 493 (1st Cir. 1992) (citations omitted). If "considerations of practicality and wise judicial administration" weigh against granting a declaratory judgment, a trial court may choose not to grant it. Covidien LP v. Esch, 993 F.3d 45, 52 (1st Cir. 2021) (quoting Wilton v. Seven Falls Co., 515 U.S. 277, 288 (1995)).

 C. *Uberrimae Fidei*

"[T]he doctrine of *uberrimae fidei* is an established rule of maritime law" in the First Circuit. Catlin at Lloyd's v. San Juan Towing & Marine, 778 F.3d 69, 81 (1st Cir. 2015); *see also* QBE Seguros v. Morales-Vázquez, 986 F.3d 1, 6 (1st Cir. 2021) ("*uberrimae fidei* is firmly entrenched in the jurisprudence of this Circuit".). Under *uberrimae fidei*, "when the marine insured fails to disclose to the marine insurer *all* circumstances known to it and unknown to the insurer which 'materially affect the

insurer's risk,' the insurer may void the marine insurance policy at its option." Catlin at Lloyd's, 778 F.3d at 83 (quoting Windsor Mount Joy Mut. Ins. Co. v. Giragosian, 57 F.3d 50, 55 (1st Cir. 1995)). Failure to disclose the true value of a vessel, a vessel's purchase price, and the level of deterioration of a vessel may all qualify as material facts, "the nondisclosure of which violates *uberrimae fidei*." Id. at 82 (citations omitted). This doctrine is strict, requiring "the parties to a marine insurance policy to accord one another the highest degree of good faith." Giragosian, 57 F.3d at 54 (citation omitted) (requiring the insured to disclose to the insurer "all known circumstances that materially affect the insurer's risk"). "Once policy coverage has commenced, the doctrine imposes an equally strict, continuing obligation on the vessel owner to ensure that the vessel will not, through either bad faith or neglect, knowingly be permitted to break ground in an unseaworthy condition." Id. at 55 (citation omitted).

## IV.   ANALYSIS

As a preliminary matter, Aspen has brought an actual controversy before the Court, as it seeks to clarify that the Policy is void and that it has no obligation to Dr. Rodriguez in relation to damages stemming from the Vessel's January 11, 2025, sinking. *See* Almonte Almonte, 15 F.Supp. 2d at 181-82; (Docket Nos. 1 and 10). Exercising its discretion, the Court will issue the judgment to clarify what,

if any, legal rights and obligations Aspen has to Dr. Rodriguez. *See* Ernst & Young, 45 F.3d at 534.

Pursuant to First Circuit precedent on *uberrimae fidei*, the Court concludes that Dr. Rodriguez's misrepresentations made when obtaining the Policy render it voidable. *See* Catlin at Lloyd's, 778 F.3d at 81; (Docket No. 1 ¶¶ 23-25). As represented by Aspen: (i) Dr. Rodriguez did not disclose three previous insurance claims he had made in relation to damage to vessels he owned; (ii) he did not disclose his previous ownership of another vessel; (iii) he falsely held himself out as having taken a navigation course; (iv) he stated he paid $905,000.00 for the Vessel when he actually paid $999,999.00; (v) he provided the wrong date of purchase for the Vessel; and (vi) he did not disclose that he employed a hired captain "the majority of the time" to oversee the Vessel. (Docket No. 1 ¶ 23). In Catlin at Lloyd's, the First Circuit specifically noted that the insured's failure to disclose the actual purchase price and value of a vessel were material facts, "the nondisclosure of which violates *uberrimae fidei*." 778 F.3d at 82. While that case involved a more significant difference in value— the insured represented to the insurer that its vessel had previously been insured for $700,000 more than the original purchase price— the guiding principle applies: the purchase price and value of a vessel are material facts that carry significant weight when an insurer weighs whether to insure the

vessel. *See* id. Aspen's decision to specifically inquire about these factors before issuing the Policy also weighs in favor of their materiality.

Furthermore, *uberrimae fidei* is a stringent doctrine, requiring "the highest degree of good faith" between the insurer and insured. Giragosian, 57 F.3d at 54. When obtaining the Policy, Dr. Rodriguez made five misrepresentations on various aspects of his ownership of the Vessel, his navigational experience, and the individuals who could operate the Vessel, failing to act in the "highest degree" of good faith as outlined in Giragosian. 57 F.3d at 54; (Docket No. 1 ¶ 23). Any of these misrepresentations could have impacted Aspen's decision whether and how to insure the Vessel. After Dr. Rodriguez's failure to act in the utmost good faith when obtaining the Vessel's insurance, Aspen could— and did— void the Policy. *See* Catlin at Lloyd's, 778 F.3d at 82-83.

Judgment can be granted under *uberrimae fidei* alone without reaching Aspen's additional allegations. Dr. Rodriguez violated the Policy by making multiple misrepresentations, which void the Policy under *uberrimae fidei* and Aspen has no obligation to pay claims under it.

## V. CONCLUSION

Having reviewed the pleadings submitted by Aspen, Dr. Rodriguez's failure to plead or otherwise defend, and the Clerk of

Court's entry of Defendant's default (Docket No. 9), the Court hereby **ORDERS** that default judgment be granted for Plaintiff, Aspen American Insurance Company. Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 9th day of June 2025.

                                            s/Raúl M. Arias-Marxuach
                                            UNITED STATES DISTRICT JUDGE